IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROBERT O. HAYNES, on behalf of
himself and all others similarly
situated,

    Plaintiff,

     v.

STARWOOD HOTELS & RESORTS
WORLDWIDE, INC.,

    Defendant.

CIVIL ACTION FILE
NO. 1:06-CV-2599-TWT

ORDER

This is an employment discrimination action.  It is before the court on the

Defendant's Motion for Summary Judgment [Doc. 42].  For the reasons set forth

below, the Defendant's motion is GRANTED.

I. BACKGROUND

The Plaintiff Robert Haynes was formerly employed by the Defendant

Starwood Hotels & Resorts Worldwide, Inc. at the Westin Peachtree Plaza Hotel

("Peachtree Plaza") in Atlanta, Georgia.  The Defendant is a Maryland corporation

that owns or manages nearly 900 hotel properties worldwide.  The Plaintiff began

working at the Peachtree Plaza in 1975 in the security department.  In 1979, he

became Credit Manager for the hotel. The Plaintiff's duties as Credit Manager included directing and managing the collection of delinquent accounts, conducting credit investigations, billing guests, setting up billing accounts, and training subordinates. (Haynes Aff. ¶ 7).

In 2002, the Plaintiff began receiving negative reviews about his job performance. During that year, his supervisor, Leroy Boehme, gave the Plaintiff a "D" grade (meaning does not meet expectations) with regard to training his subordinates. Overall, he received a grade of "M" (meaning that he met expectations), and even earned an "E" grade (exceeding expectations) in the specific area of financial objectives. Thus, while the Plaintiff was primarily doing a "great job" and left the Peachtree Plaza in "a great shape with [write] offs," Boehme felt that he neglected his training and managerial duties. (Def.'s Mot. for Summ. J., Ex. 2, at 67-68)[1]. From May 2000 to May 2004, Mr. Boehme gave the Plaintiff an overall grade of a "B-minus," or "slightly above average." (Boehme Dep. at 21).

In 2002, the Plaintiff's position was reclassified by the Defendant from a 40-hour work week salary position to an hourly position. The Plaintiff, who was at this time 57 years old, began working 50 hours (40 hours plus 10 overtime hours) to

---

[1]The page numbers refer to the Bates stamp numbers at the bottom of the pages in Exhibit 2. The pages are not in numerical order in the exhibit.

maintain the equivalent of his previous salary. In 2004, Mike Hsiang became the Controller at the Peachtree Plaza, replacing Leroy Boehme as the Plaintiff's supervisor. A new Assistant Controller, Karen Bartlett, arrived shortly thereafter. The new management team wanted the Plaintiff to assume some new responsibilities such as taking active supervision of the accounts receivable staff and to begin managing collections. In that year, Bartlett gave the Plaintiff a grade of "D" as his overall evaluation. Although the Plaintiff again exceeded expectations in the collection of accounts receivable, he still failed to satisfactorily train subordinates to a level where they could operate in his absence. The Plaintiff was criticized for not "committing the necessary time to train the [Accounts Receivable] staff as well as staff of other departments as necessary." (Def.'s Mot. for Summ. J., Ex. 2, at 43). Management also criticized the Plaintiff for failing to sign up for basic classes in computer programs in Microsoft Office and he was urged to "utilize this technology to improve [his] efficiency." (Def.'s Mot. for Summ. J., Ex. 2, at 37).

In March 2005, the Plaintiff received a written reprimand called a Progressive Discipline Documentation ("PDP") for physically handling checks. The Peachtree Plaza's policy prohibited the Plaintiff from handling checks in any way. (Def.'s Mot. for Summ. J., Ex. 2, at 38). In September of that year, the Plaintiff received an email

scolding him for working off the clock where he started working one day at 7:30 A.M., but failed to sign the time sheet until 8 A.M.  (Haynes Aff. ¶ 18).

In 2005, the Plaintiff again received an overall evaluation of "D" for his "Big 5 Objectives."  The Plaintiff earned this evaluation despite receiving grades of "M" for 60% of his overall effectiveness and "D" for the remaining 40%.  (Def.'s Mot. for Summ. J., Ex. 2, at 23-26).  Although the Plaintiff again met the Accounts Receivable Aging goals, management criticized the Plaintiff for "not develop[ing] a plan to resolve obstacles that continue to hamper the A/R and credit process. . . . Bob continues to be bogged down with last minute credit processing and account set up." (Def.'s Mot. for Summ. J., Ex. 2, at 23).  Again, the Plaintiff failed to complete either a Word or Excel course.  (Def.'s Mot. for Summ. J., Ex. 2, at 24).  By this time, the Plaintiff was already using these computer programs at an "intermediate level" and he felt that basic level course instruction would be "a waste of time."  (Haynes Aff., Ex. A).  The Plaintiff received mixed reviews in areas of leadership and training subordinates in 2005, and received a grade of "M" in the category of "Development of Others."   In sum, the Plaintiff struggled to satisfy his superiors in his non-accounting duties: "Focus areas for the remainder of the year, need to be on training (both inside and outside the department), process improvements, supporting your

team, and maintaining a positive attitude." (Def.'s Mot. for Summ. J., Ex. 2, at 31).

By the end of the year, management concluded:

> In spite of specific directions for training, changes to A/R account management, and leadership improvement Bob has performed poorly and has not accomplished required goals.  Bob continues to perform in his own manner without regard for direction from department management, improving his area of responsibility, or team success.  This performance is an obvious refusal to follow directions of department management.

(Def.'s Mot. for Summ. J., Ex. 2, at 32).

In February 2006, Bartlett gave the Plaintiff another "Progressive Discipline Documentation."  The PDP reprimanded the Plaintiff for two delinquent credit accounts, a guest complaint, failing to wear a coat in public, and for failing to replace his identification badge.  The next month, in March 2006, after 2 consecutive years of "D" reviews, Hsiang and Bartlett required the Plaintiff to complete a Performance Improvement Plan ("PIP") or risk losing his job.  The plan gave the Plaintiff 60 days to make "significant progress" in a leadership role, "self and staff development and responsiveness, time management, hands on involvement in key A/R and credit processes, being proactive in addressing/following up on issues both inside and outside the department, and improved communication."  (Def.'s Mot. for Summ. J., Ex. 2, at 1).  The Plaintiff's success with the PIP would be measured by his ability to complete 35 different objectives.  Thirty days after the Plaintiff received the PIP,

Hsiang informed the Plaintiff that he was not likely to succeed.  (Haynes Aff., Ex. A).

Hsiang informed the Plaintiff that he had met only 40% of his performance objectives.

The Plaintiff was given the option of being dismissed immediately or submitting a

resignation effective in six weeks.  He chose to resign.  His final day of work was July

14, 2006.  On August 17, 2006, the Plaintiff filed a discrimination claim with the

EEOC against the Defendant.  At the conclusion of its investigation, the EEOC found

no violation of the ADEA by the Defendant.

## II. MOTION FOR SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and

affidavits submitted by the parties show that no genuine issue of material fact exists

and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The court should view the evidence and any inferences that may be drawn in the light

most favorable to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59

(1970).  The party seeking summary judgment must first identify grounds that show

the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S.

317, 323-24 (1986).  The burden then shifts to the nonmovant, who must go beyond

the pleadings and present affirmative evidence to show that a genuine issue of material

fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III. DISCUSSION

A.    The Plaintiff's ADEA Claim

Under the ADEA, it is "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). An employee bringing an ADEA claim can prove intentional discrimination by presenting direct evidence of discriminatory intent, or through the four prong analysis established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). In this case, the Plaintiff concedes that he has no direct evidence of discrimination. Therefore, he must make a prima facie showing that he: (1) is a member of a protected class; (2) suffered an adverse employment action; (3) was replaced by a substantially younger person; and (4) was qualified for the position. Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1359 (11th Cir. 1999). Proof of a prima facie case raises a presumption of illegal discrimination. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981); Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). The burden then shifts to the defendant to demonstrate a legitimate, non-discriminatory reason for the employment decision. See McDonnell Douglas

Corp., 411 U.S. at 802.  This burden is "exceedingly light."  Holifield v. Reno, 115

F.3d 1555, 1564 (11th Cir. 1997).

After the employer articulates such a reason, the plaintiff has the opportunity

to demonstrate that this reason is merely a pretext for discrimination.  Pretext may be

demonstrated either through additional evidence showing "the employer's proffered

explanation is unworthy of credence," Burdine, 450 U.S. at 256, or by relying solely

on the same evidence that comprised the prima facie case.  St. Mary's Honor Center

v. Hicks, 509 U.S. 502, 511 (1993).  In reviewing the defendant's explanation,

however, the Court cannot usurp an employer's legitimate business judgment in the

absence of evidence of discrimination.  E.E.O.C. v. Total Sys. Servs., Inc., 221 F.3d

1171, 1176 (11th Cir. 2000) ("[i]n making business decisions (including personnel

decisions), the employer can lawfully act on a level of certainty that might not be

enough in a court of law").  Indeed, once a defendant proffers legitimate

nondiscriminatory reasons for its actions, "[i]n order to avoid summary judgment, a

plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that

each of the employer's proffered nondiscriminatory reasons is pretextual."  Chapman,

229 F.3d at 1037; accord White v. Verizon South, Inc., 299 F. Supp. 2d 1235, 1241

(M.D. Ala. 2003).  In other words, the plaintiff must be able to show "such

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the

employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Cooper v. Southern Co., 390 F.3d 695, 725 (11th Cir. 2004) (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997)).

The Defendant argues that the Plaintiff has not made a prima facie case under the ADEA.  The Defendant does not challenge the Plaintiff's age, termination, or replacement, but claims that the Plaintiff was not qualified for his job as Credit Manager.  The Defendant asserts that the Plaintiff was not qualified because he was not "satisfactorily performing his job" duties.  (Def.'s Mot. for Summ. J., at 5).  This argument has been rejected, clearly and repeatedly, by the Eleventh Circuit.  "Our precedent holds that if a plaintiff has enjoyed a long tenure at a certain position, we can infer that he or she is qualified to hold that particular position." Damon, 196 F.3d at 1360 (citing Clark v. Coats & Clark, 990 F.2d 1217, 1227 (11th Cir. 1993); Pace v. Southern Railway System, 701 F.2d 1383, 1386 n.7 (11th Cir. 1983)).  "We also have unambiguously held that allegations of poor performance against plaintiffs discharged from long-held positions may be properly considered, only *after* a prima facie case has been established, when a court evaluates the pretextual nature of an employer's proffered nondiscriminatory reasons for termination."  Damon, 196 F.3d at 1360 (citing Clark, 990 F.2d at 1227; Young v. General Foods Corp., 840 F.2d 825, 830 n.3

(11th Cir. 1988)) (emphasis in original).  In this case, the Plaintiff was employed as Credit Manager from 1979 to 2006, a period of 27 years.  It is assumed that the Plaintiff was qualified for his position for the prima facie case analysis.

It is, therefore, the Defendant's burden to proffer a legitimate, non-discriminatory reason for terminating the Plaintiff.  In its motion for summary judgment, the Defendant offers a laundry list of non-discriminatory reasons for the Plaintiff's forced resignation.  Generally, the Defendant alleges that the Plaintiff performed his job poorly, displayed weak leadership, and did not follow directions.  More specifically, the Defendant alleges that the Plaintiff failed to adequately train his subordinates, was tardy to work, did not change the date of the monthly credit meetings as requested, handled checks in violation of the Defendant's policy, worked while he was off the clock, refused to order office supplies for a new subordinate, did not order a correct identification badge, waited for years to take classes on Windows operating systems, failed to follow up on unpaid bills, once appeared coatless on the hotel floor, and failed to change the coding of the aging accounts receivable.

The Plaintiff now has the burden of demonstrating that the Defendant's reasons for firing him were a pretext for discrimination.  A plaintiff may do so "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is

unworthy of credence." <u>Jackson v. Alabama State Tenure Comm'n</u>, 405 F.3d 1276, 1289 (11th Cir. 2005).  In this case, the Plaintiff generally alleges that the Defendant, together with its employees Mike Hsiang and Karen Bartlett, conspired to increase his duties to make him unlikely to succeed.  The Plaintiff bolsters this argument by pointing out that he received no overall dissatisfactory performance reviews until Hsiang and Bartlett arrived at the Peachtree Plaza.  Nothing, it seemed, would satisfy his new bosses.  He argues that it is suspicious that an employee who had always received positive reviews (especially in his core, measurable functions) immediately began receiving poor reviews once he was under the supervision of the younger Hsiang and Bartlett.

The Defendant points out, however, that satisfactory reviews from a previous supervisor do not, in and of themselves, create material issues of fact when a later supervisor gives poorer reviews.  "Different supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important." <u>Rojas v. Florida</u>, 285 F.3d 1339, 1343 (11th Cir. 2002).  While poor evaluations from a new supervisor can be circumstantial evidence of discrimination against a person with a good employment history, the Plaintiff must still present evidence to dispute the reasons proffered for termination.  <u>Id.</u>  Ultimately, the Plaintiff must give sufficient evidence to create a

genuine issue of material fact that "each of the defendant employer's articulated reasons is pretextual." Chapman, 229 F.3d at 1025.

The Plaintiff has rebutted some, but not all, of the Defendant's reasons for his forced resignation. First, the Plaintiff is unable to show that his failure to adequately train subordinates was pretextual. The Plaintiff admits that he "needed to devote more time to developing others." (Haynes Aff. ¶ 15). The Plaintiff argues that his supervisors tried to saddle him down with too many duties, and that he had indeed focused on training others until "the increased workload placed upon me by Hsiang and Bartlett interfered." (Haynes Aff. ¶ 15). The Plaintiff has introduced evidence that he was at times extraordinarily busy – one of his subordinates was on maternity leave in 2005 and he was given no additional relief. (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J., at 5). However, there is significant evidence that the Plaintiff was ineffective at training others even before Hsiang and Bartlett came to the Peachtree Plaza. In 2002, Boehme wrote in the Plaintiff's mid-year evaluation that the Plaintiff "need[ed] to make the time to [train two accounts receivable employees]. Teaching two people how to do a task that takes him half an hour will free up an hour of his time." (Def.'s Mot. for Summ. J., Ex. 2, at 40). By the end of 2002, Boehme stated that "[g]oal not met. Spent two hours with the appropriate people on it for the entire year." (Def.'s Mot. for Summ. J., Ex. 2, at 68). The Plaintiff has introduced evidence

to dispute Boehme's specific calculations: "I reminded Austin Boehme that I had trained [an employee] in all of these areas.  Austin then said 'Okay.'" (Haynes Aff. ¶ 11).  Yet the fact remains that Boehme, a self-described friend of the Plaintiff's, felt the Plaintiff would have performed better had he emphasized training others.  "He did not really engage with the hourly staff within accounting.  He could have . .. Because the people that were working under him were doing components of what he was responsible for, he could have worked with them a little more closely and developed them."  (Boehme Dep. at 21).  Most telling, Boehme opined that "Bob needs to work at sharing his abilities with those that are here to support him.  He has a lot of knowledge and ability . . . but Bob would benefit by being more productive and [less] stressed in his duties."  (Def.'s Mot. for Summ. J., Ex. 2, at 79).  The Plaintiff's deficiencies in this area confined his performance under Boehme to a "B-minus" or only "slightly above average."  (Boehme Dep. at 21).

When the new managers arrived, they continued to cite the Plaintiff for not training others sufficiently, especially the accounts receivable employees.  The Plaintiff's year-end review in 2004 stated: "Neither AR Clerk nor AR Supervisor are able to process DB applications and/or recommend credit.  AR Clerk cannot set up group billings."  (Def.'s Mot. for Summ. J., Ex. 2, at 36).  Also, the Plaintiff's "staff is able to cover each other during absence, however, you have not trained them to

cover you in your absence.  Neither can process a DB application." (Def.'s Mot. for Summ. J., Ex. 2, at 36).

Given that a previous supervisor noted that the Plaintiff struggled in this area, the Plaintiff has not shown that this reason was a mere pretext for age discrimination. The Plaintiff has offered no concrete evidence that younger managers were given less responsibility because of their age, that it was inappropriate to expect the Plaintiff to supervise and cross-train the accounts receivable clerks, or that the additional tasks were not possible.  The Plaintiff's only evidence is a blank assertion that he was given more work to set him up for failure.  The Plaintiff has simply not produced evidence to suggest that his new supervisors were only trying to get him "bogged down," considering that Boehme had previously encouraged the Plaintiff to teach "two people how to do a task that takes him half an hour will free up an hour of his time." (Def.'s Mot. for Summ. J., Ex. 2, at 63).  And while the Plaintiff presents evidence that he ultimately did cross-train his subordinates successfully, he did not complete this until his probationary period.

Further, just because it was not deemed important enough for Boehme to dismiss the Plaintiff over this flaw, a later supervisor is free to "enforce policies that a previous supervisor did not consider important." Rojas v. Florida, 285 F.3d 1339, 1343 (11th Cir. 2002).  For instance, in 2004, Hsiang and Bartlett specifically ordered

"[c]ross training between you and your staff so all 3 are interchangeable. . . .  A grade of D is achieved if any of the three do not fully know and understand all of the functions for Credit and A/R."  (Def.'s Mot. for Summ. J., Ex. 2, at 61).  In fact, supervising the accounts receivable staff was an "Essential Function" in the Plaintiff's 2004 job description.  (Def.'s Mot. for Summ. J., Ex. 2, at 29).  The Plaintiff did not meet the legitimate performance goals of the new management.  This fact, combined with Boehme's marginal overall evaluation of the Plaintiff, leaves the Court unconvinced this reason is a pretext.

A second legitimate reason proffered by the Defendant was the Plaintiff's failure to move the credit meetings from the end of each month to the middle of each month.  The Plaintiff insists that this was not a feasible request, because "a switch to mid-month gave me just two weeks to collect information on the previous month's bills, which was simply not enough time."  (Haynes Aff. ¶ 23).  Despite the Plaintiff's assertions, the meeting was moved to mid-month after the Plaintiff's resignation, and the Defendant has maintained the mid-month credit schedule since the Plaintiff has left.  (Def.'s Reply in Supp. of Mot. for Summ. J., at 12).  Again, the Plaintiff's sole evidence as to pretext is that he did not have enough time.  Yet the Defendant's successful move of the meeting shows that the move itself was possible, despite giving the credit department only two weeks to collect billing information.  The

permanence of the move shows that it was important to the Defendant, not a sadistic assignment conjured up to oust the Plaintiff.

An additional legitimate reason offered by the Defendant was that the Plaintiff did not take Microsoft operating system courses as instructed.  The Defendant argues that the Plaintiff's failure shows that he was inefficient, lacked technical knowledge, and was insubordinate towards Hsiang and Bartlett.  In 2004, Bartlett gave the Plaintiff an initial deadline of December 2004 to take an introductory course of Microsoft Word and Microsoft Excel.  (Def.'s Mot. for Summ. J., Ex. 2, at 37).  Although the Defendant admits that the Plaintiff "[s]elf taught Excel and completed numerous spread sheets required by several customers for billing purposes," the Defendant still wanted the Plaintiff to take these courses to improve the Plaintiff's efficiency and keep from getting "bogged down."  (Def.'s Mot. for Summ. J., Ex. 2, at 36-37).  Management again cited the Plaintiff for not taking the courses in 2005, and he did not complete the courses until 2006 when he was given his PDP.  Although the Plaintiff presented some evidence that he did not need to take the course to use the Microsoft Office programs efficiently (the Plaintiff claims he was using the programs at an intermediate level), this is evidence that he ignored the instructions of his supervisors repeatedly.  Here again, the Plaintiff claims that time was too limiting a factor to sign up for the courses.  However, because the Plaintiff had over two years

to complete this task, his failure to take the courses reinforces management's claim that "Bob repeatedly disrespects the chain of command." (Def.'s Mot. for Summ. J., Ex. 2, at 80).

Given that a previous supervisor critiqued the Plaintiff for his lackluster training of coworkers and inefficiency, the Plaintiff is unable to show that the same criticisms by later supervisors (against whom the Plaintiff is charging discrimination) were simply invented to discharge the Plaintiff. The Plaintiff has not carried his burden of rebutting every legitimate reason offered by the Defendant.

In attempting to show that all the proffered reasons were a pretext, the Plaintiff brings in evidence of disparaging treatment towards other older employees by Hsiang and Bartlett. As the Plaintiff notes, at least two longtime employees left the Peachtree Plaza shortly after the new management arrived. The Plaintiff's coworkers, Brenda Nix and Ed Moulton, were both over fifty years of age and all allegedly "had their workloads increased to the point that they could not meet 'expectations' and were placed on probationary periods." (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J., at 16). In Damon v. Fleming Supermarkets, 196 F.3d 1354 (11th Cir. 1999), the Eleventh Circuit held that evidence of a pattern could emerge when multiple employees were forced out of their positions and replaced with younger people. Id. at 1361. The Plaintiff also claims that Hsiang once told staffers that they were not to be a bunch of

"old dogs" who could not learn new tricks.  (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J., at 16-17).  While "stray remarks" may not by themselves support a finding of pretext, the Eleventh Circuit has allowed such remarks to be used as evidence of pretext.  Id. at 1362.  Additionally, the Plaintiff notes instances where he was treated differently than his younger coworkers.  The Plaintiff argues that he was once reprimanded for working late ("off the clock") while his younger subordinate, Michael Morgan, was commended.  (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J., at 17).  Further, the Plaintiff only maintained an hourly position when other younger managers were salaried, even though his position qualified for a salary.

The Plaintiff's general allegations of animus are insufficient to show that all of the Defendant's legitimate reasons are pretextual.  Although proof of animus may aid an ADEA plaintiff in showing pretexts in specific instances, the Plaintiff is still required to present "evidence that directly rebut[s] the proffered reasons of the employer." Crawford v. City of Fairburn, 482 F.3d 1305, 1309 (11th Cir. 2007).  For instance, in this case, the claims that new management forced out older employees with unbearable workloads might have been more convincing had more evidence of the younger employees' relative workloads been presented.  The Plaintiff has presented insufficient evidence to show that younger employees and managers were expected to engage in less training and other responsibilities.  Although the

Defendant's treatment of a longtime employee was perhaps unfair, the Defendant's conduct does not rise to the level of an actionable claim under the ADEA under these circumstances.

      B.    <u>Intentional Infliction of Emotional Distress</u>

The Plaintiff also asserts a claim for intentional infliction of emotional distress. To succeed on a claim for intentional infliction of emotional distress, the Plaintiff must show: (1) intentional or reckless conduct; (2) which is extreme and outrageous; (3) causing emotional distress; and (4) which is severe. <u>Board of Public Safety v. Jordan</u>, 252 Ga. App. 577, 586 (2001).

The claim must fail because the Defendant did not engage in conduct rising to "the requisite level of outrageousness." <u>Jordan</u>, 252 Ga. App. at 586. Under Georgia law, the mere termination of an employee will not support an intentional infliction of emotional distress claim. <u>See, e.g.</u>, <u>Clark v. Coats & Clark</u>, 990 F.2d 1217, 1229 (11th Cir. 1993). Georgia is an at-will employment jurisdiction. At-will employees have no claim unless the tortious firing claim is "clearly [independent] of the severance of employment." <u>Mr. B's Oil Co., Inc. v. Register</u>, 181 Ga. App. 166, 168 (1986). The Plaintiff's distress is largely due to his termination. <u>See</u> (Haynes Aff. ¶ 35) ("I have seen physicians for several conditions . . . which I have been told were caused by stress. . . . while I am not disabled, my wife is, and my need to be the sole breadwinner

certainly contributes to my stress.); (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J., at 8) ("Starwood took none of this into account when it decided it wanted to move the 61-year-old Bob Haynes out.").  To the extent that his distress was caused by Bartlett and Hsiang's demeaning actions while the Plaintiff was still employed, "it is clear that the language used by [Hsiang and Bartlett] consisted either of dissatisfaction with [the Plaintiff's] job performance or suggestions that if [he] did not improve [his] job performance [he] might be terminated." Biven Software, Inc. v. Newman, 222 Ga. App. 112, 114 (1996) (citation omitted).  Similar to the defendant in Biven Software, the Defendant's actions were not outrageous under Georgia law even though Bartlett and Hsiang "spoke to [the Plaintiff] in a rude tone and condescending manner, belittled [him], was critical of [his] work, and imposed unreasonable deadlines." Id. For this reason, the Plaintiff's emotional distress claim fails.

## IV. CONCLUSION

For the reasons set forth above, the Defendant's Motion for Summary Judgment [Doc. 42] is GRANTED.

SO ORDERED, this 21 day of September, 2007.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge